IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LAKESHA JOHNSON,     :
            :
   Plaintiff,    :
            :
v.          :  CIVIL ACTION NO.
            :  1:12-CV-03823-TWT-JCF
JP MORGAN CHASE, MILES  :
TAMBURRI-SMITH, individually, and :
JEFF ROME, individually   :
            :
   Defendant.   :

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendants' Motion For Summary Judgment (Doc. 45) and Plaintiff's Notice Of Objection To The Declaration Of Tiffany Harris Or, In The Alternative, Motion To Strike (Docs. 50, 55). For the reasons discussed below, Plaintiff's objection to Ms. Harris's Declaration is **OVERRULED**, and her motion to strike is **DENIED**. It is further **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** and Plaintiff's Complaint be **DISMISSED**.

## PROCEDURAL HISTORY

Plaintiff LaKesha Johnson ("Plaintiff"), an African-American woman, was formerly employed by JPMorgan Chase Bank, N.A. ("Chase") until she was terminated on February 21, 2012. (Doc. 1 at ¶¶ 1, 18). On October 31, 2012,

Plaintiff filed this lawsuit against Chase and her former managers, Miles Tamburri-Smith ("Smith") and Jeff Rome ("Rome"), alleging that Defendants discriminated against her because of her race and color in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981, and retaliated against her for engaging in statutorily protected conduct in violation of Title VII and § 1981.  (Doc. 1).  Defendants answered Plaintiff's Complaint (*see* Doc. 16), and discovery proceeded.

Defendants have now filed a motion for summary judgment (Doc. 45) with supporting brief (Doc. 45-1), statement of undisputed material facts (Doc. 45-2), and exhibits (Docs. 45-3 through 45-18).  Plaintiff filed a brief in response to Defendants' motion (Doc. 47) and exhibits (Docs. 47-1 through 47-30); a response to Defendants' statement of undisputed material facts (Doc. 48) and exhibits (Docs. 48-1 through 48-18); and a statement of disputed material facts (Doc. 49) with exhibits (Docs. 49-1 through 49-14).  Defendants filed a reply brief (Doc. 53) and exhibit (Doc. 53-1), and a response to Plaintiff's statement of material disputed facts (Doc. 54).  The Court granted Plaintiff leave to file a surreply (*see* Docs. 59, 59-1, 59-2), and Defendants filed a response to the surreply (Docs. 60, 60-1, 60-2).

Plaintiff also filed an objection to the Declaration of Tiffany Harris, filed by Defendants in support of their motion for summary judgment (*see* Doc. 45-18), or in the alternative, a motion to strike Ms. Harris's Declaration.  (Docs. 50, 55).

2

Defendants filed a response to Plaintiff's objection and motion to strike (Docs. 52, 52-1 through 52-3); Plaintiff did not submit a reply.

With briefing complete, the undersigned turns to the merits of the parties' motions.

## PLAINTIFF'S OBJECTION/MOTION TO STRIKE HARRIS DECLARATION (DOCS. 50, 55)

Plaintiff objects to the Declaration of Ms. Harris submitted in support of Defendants' motion on the ground that "Chase never disclosed Ms. Harris as a potential witness in this case despite plenty of opportunity to do so." (Doc. 50 at 1). Ms. Harris is a Human Resources Business Partner with Chase. (Doc. 45-18 at ¶ 1). Plaintiff contends that Defendants did not disclose Ms. Harris "in any of its discovery responses or its Initial Disclosures filed with this Court." (Doc. 50 at 2). Plaintiff requests that the Court strike Ms. Harris's declaration as "an appropriate sanction for Chase's dilatory conduct," or alternatively, allow Plaintiff "to investigate fully the information included in Ms. Harris's declaration through the deposition of Ms. Harris and recover from Chase her costs and expenses in doing so." (*Id.*).

To the extent that Plaintiff seeks to strike Ms. Harris's Declaration, a motion to strike is not the proper vehicle for challenging matters not contained in pleadings, which FED. R. CIV. P. 7(a) defines to include complaints, answers, and court-ordered replies to answers, but not briefs or supporting exhibits. *See, e.g.,*

*Circle Grp., LLC v. Se. Carpenters Reg'l Council*, 836 F. Supp. 2d 1327, 1349 (N.D. Ga. 2011) (explaining that "[m]otions to strike are governed by Federal Rule of Civil Procedure 12(f)," which "rule applies to pleadings, not to motions or briefs filed in support of motions"); *see also JP Morgan Chase Bank, N.A. v. Sampson*, No. 1:10-cv-1666-JEC, 2012 U.S. Dist. LEXIS 37514, at *6 (N.D. Ga. Mar. 20, 2012) (denying motion to strike late-filed response brief and explaining that " '[t]he terms of Rules 12(f) and 7(a) make clear that only material included in a pleading may be subject of a motion to strike and that motions, briefs or memoranda, objections, or affidavits may not be attacked by the motion to strike' " (quoting *Jeter v. Montgomery Cnty.*, 480 F. Supp. 2d 1293, 1296 (M.D. Ala. 2007))); *Hawk v. Atlanta Peach Movers, Inc.*, No. 1:10-CV-0239-JFK, 2011 U.S. Dist. LEXIS 43724, at *2-3 (N.D. Ga. Apr. 21, 2011) (denying the plaintiff's motion to strike several documents, including an affidavit, that were not pleadings).   Accordingly, Plaintiff's motion to strike Ms. Harris's Declaration (Doc. 55) is **DENIED**.

Turning to Plaintiff's objection to the Court's consideration of Ms. Harris's Declaration, the undersigned finds it to be without merit. Defendants amended their Initial Disclosures on December 13, 2013 to disclose Ms. Harris as a person with "knowledge about the allegations made by Plaintiff, Plaintiff's performance, and JPMorgan Chase's legitimate, and non-retaliatory decisions affecting

Plaintiff's employment" (*see* Doc. 41 at 8), six weeks before the January 31, 2014 close of discovery.  Because Defendants disclosed Ms. Harris as a witness during the discovery period, Plaintiff's objection to Ms. Harris's Declaration is **OVERRULED**.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 45)

## I.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).[1]  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[] . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

---

[1] Citing *Grigsby v. Reynolds Metals Co.*, 821 F. 2d 590, 595 (11th Cir. 1987), Plaintiff asserts that "[i]n general, summary judgment is an inappropriate tool for resolving claims of employment discrimination."  (Doc. 47 at 11 n.8).  The Eleventh Circuit has "rejected that proposition, explaining that 'the summary judgment rule applies in job discrimination cases just as in other cases.' "  *Denney v. City of Albany*, 247 F.3d 1172, 1182 n.4 (11th Cir. 2001) (quoting *Chapman v. A.I. Transport*, 229 F. 3d 1012, 1026 (11th Cir. 2000) (en banc)).

*see also Arnold v. Litton Loan Servicing*, *LP*, No. 1:08-cv-2623-WSD, 2009 WL 5200292, at *4 (N.D. Ga. Dec. 23, 2009) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact." (citing *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999)).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, she must respond by going beyond the pleadings, and by her own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  *See Celotex*, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' "  *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial."  *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *cert. denied*, 506 U.S. 952 (1992); *see also* FED. R. CIV. P. 56(c)(1)(B), (c)(4).   The evidence "cannot consist of conclusory allegations or legal conclusions."  *Avirgan*, 932 F.2d at 1577.  Unsupported self-serving statements by

the party opposing summary judgment are insufficient to avoid summary judgment. *See Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984).

For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. *Id.* at 249, 255. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255.

## II. <u>Facts</u>

The facts, for summary judgment purposes only, are derived from Defendant's statement of undisputed material facts (Doc. 45-2, hereinafter "Def. SMF"); Plaintiff's statement of material facts (Doc. 49, hereinafter "Pl. SMF"); Plaintiff's response to Defendants' statement of undisputed material facts (Doc. 48); Defendants' response to Plaintiff's statement of material facts (Doc. 54);

Plaintiff's deposition (Doc. 47-6, hereinafter "Johnson Dep."); Smith's deposition (Doc. 47-12, hereinafter "Smith Dep."), and uncontroverted record evidence.[2]

The undersigned has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried. Yet the court need not "scour the record" to make that determination. *Tomasini v. Mt. Sinai Med. Ctr. of Fla.*, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (internal quotation omitted). The facts are construed in the light most favorable to Plaintiff as the non-movant. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001).

### A.    Chase's Acquisition of Washington Mutual

Washington Mutual hired Plaintiff on July 8, 2008 as a Small Business Specialist in its Marietta, Georgia office. (Def. SMF ¶ 13). As a Small Business Specialist, Plaintiff's job duties included, among other things, visiting ten office branches and coaching personal bankers and branch managers on how to provide small business banking products and services. (Def. SMF ¶ 14). In 2008, Chase acquired Washington Mutual, and Plaintiff became an employee of Chase on

---

[2] As Defendants point out in their reply (Doc. 53 at 1), Plaintiff did not set out in her statement of disputed material facts many of the factual assertions she includes in the "Statement of Facts" section of her response brief. (*Compare* Doc. 47 at 2-10 *with* Doc. 49). This Court's Local Rules provide that the Court will not consider facts set out only in a summary judgment brief and not in a party's statement of material facts. *See* LR 56.1 B.(1) & (2)(b).

August 4, 2008.  (Def. SMF ¶ 15).  During the acquisition transition period, Plaintiff performed substantially the same job duties as a Small Business Specialist that she performed while working for Washington Mutual.  (Def. SMF ¶ 18).  In 2009, Plaintiff began reporting to Defendant Jeff Rome (Caucasian), then a Chase Business Banking Market Manager.  (Def SMF ¶ 17).

### B.   Plaintiff's Placement In Business Banker Position

During the spring of 2009, Rome recommended Plaintiff for a Business Banker position, and selected Erica Kuniasky, who was also a Small Business Specialist like Plaintiff, for a Business Wholesaler position.  (*See generally* Def. SMF ¶¶ 19-34).  Plaintiff believed the Business Wholesaler position was similar to her job duties as a Small Business Specialist, except that Business Wholesalers visited more branches, received incentive pay based on the performance of the branch teams they were coaching, and conducted outside training and formal training sessions with upper management.  (Def. SMF ¶ 24).  In contrast, the Business Banker role involved recommending small business banking products and services at a single branch, and focused on the Business Banker's individual contributions and performance.  (Def. SMF ¶ 25).  Plaintiff testified that she wanted the Business Wholesaler position, and she believed her selection as a Business Banker was a demotion.  (*See* Johnson Dep. at 46-47, 58-60, 69, 78-79).

9

On May 1, 2009, Plaintiff began working as a Business Banker at Chase's Midtown Atlanta branch. (Def. SMF ¶ 35). As a Business Banker, Plaintiff was responsible for all business activity that occurred at her branch, including coaching Personal Bankers on how to open business accounts and discover account opportunities. (Def. SMF ¶ 41). Plaintiff was also responsible for opening business depository accounts and taking loan applications for business clients. (Def. SMF ¶ 42). At first, Plaintiff reported to a variety of managers as a Business Banker. (Def. SMF ¶ 36). In December 2009, she began reporting to Smith (bi-racial/African-American and Caucasian), the Branch Business Banking Area Manager, who worked in Chase's Monarch Tower location in Atlanta.[3] (Def. SMF ¶ 37). Plaintiff reported to Smith until her termination on February 21, 2012. (Def. SMF ¶ 38; Pl. SMF ¶ 3). Smith reported to Pam Evans from December 2009 until the summer of 2010, and then reported to Rome for the remainder of Plaintiff's employment. (Def. SMF ¶ 40).

### C. <u>Plaintiff's 2009 Performance Review</u>

On February 19, 2010, Smith gave Plaintiff her 2009 performance review, which covered her first four months in the Business Banker position. (Def. SMF ¶ 50). While discussing her review with Smith, Plaintiff informed Smith that she

---

[3] Approximately sixteen Business Bankers at various branches reported to Smith during Plaintiff's employment. (Def. SMF ¶ 53).

wanted to move to a Relationship Manager position, and included this comment as a career goal in her review.  (Def. SMF ¶ 51).  Smith believed that "one day . . . she may get there," but he felt that Plaintiff "need[ed] to focus on cleaning up her work and being more consistent in her production," and needed "a lot of coaching and development on the products and current role" and "better understanding on the RM products (especially credit and cash management) before she should consider the RM role."  (Doc. 45-11 at 17).  Even though Smith made positive comments in her review, Plaintiff did not agree with it because he said she needed more development before pursing the Relationship Manager role.  (Johnson Dep. at 105-06).

### D.   <u>Plaintiff's Working Relationship With Smith</u>

Plaintiff believed her working relationship with Smith was akin to a "dictatorship" when she first began reporting to him.  (Def. SMF ¶ 55).  Smith wanted employees to follow certain rules and processes, and he informed his subordinates during "stressful" and "strenuous" meetings that they needed to respect his role as a manager.  (Def. SMF ¶ 56).  During these meetings, Smith informed the Business Bankers who had worked for Washington Mutual that they needed to get "on the bandwagon" with Chase Business Bankers and perform like them.  (Def SMF ¶ 57).  Plaintiff understood why Smith informed employees that they needed to perform, but she had a problem with Smith's manner of delivery of

his messages.  (Def. SMF ¶ 59).  Plaintiff also testified that during these meetings Smith "would call out your name, would make statements as you must be a fool if you don't do this, if you didn't come to me for that."  (Johnson Dep. at 101).  Plaintiff also believes that Smith "targeted" her by increasing her workload, requiring her to move her desk, color coding her calendar, and criticizing her performance.  (*See generally* Johnson Dep. at 150-93).

### E.   Plaintiff's December 2010 Application For Branch Manager Trainee Position

In December 2010, Plaintiff applied for a Branch Manager Trainee position. (Def. SMF ¶ 60; Pl. SMF ¶ 12).[4]  Chase offered Plaintiff the Branch Manager Trainee position in February 2011.  (Def. SMF ¶ 61).  After finding out about Plaintiff's job offer, Rome talked Plaintiff out of taking the position.  (Def. SMF ¶ 62; Pl. SMF ¶ 13).  Rome told Plaintiff that if she really wanted to pursue a Relationship Manager position, she should not take the path of becoming a Branch Manager.  (Def. SMF ¶ 63).  Plaintiff told Rome that she needed the position due to Smith's "mistreatment" of her, and that she wanted to become a Relationship Manager.  (Def. SMF ¶ 64).  Rome said that he would work with Smith on his delivery, and would coach Plaintiff with regard to her goal of moving into the

---

[4] Plaintiff objects to Def. SMF ¶ 60 and several of Defendants' other statements to the extent that they rely on Ms. Harris's Declaration.  As discussed above, Plaintiff's objections to that Declaration are without merit.

Relationship Manager position.  (Def. SMF ¶ 65).  Plaintiff then withdrew her application for the Branch Manager Trainee position.  (Def. SMF ¶ 66).

### F.   Plaintiff's 2010 Performance Review

On February 25, 2011, Plaintiff received her 2010 performance review from Smith.  (Def. SMF ¶ 68).  Smith indicated that Plaintiff met expectations, but noted in some areas that Plaintiff was "not on pace," such as in "funding follow up" and in booking credits.  (*See* Doc. 45-11 at 19-21).  Plaintiff disagreed with some of Smith's commentary, such as his observation that Plaintiff had inconsistent funding follow-up.  (Def. SMF ¶ 69).

### G.   Plaintiff's May 2011 Complaints To HR

On May 18, 2011, Plaintiff called Ron Jones, a Chase Human Resources Business Partner, and informed him that she had a problem with her working relationship with Smith.  (Def. SMF ¶ 70).  Mr. Jones' notes of that call indicate that Plaintiff told him "that she was filing a case against her manager for sex discrimination and creating a hostile work environment."  (*See* Doc. 47-7 at 2).  On May 24, 2011, Plaintiff submitted a five-page written complaint to Jones "due to the hostile work environment" Smith had allegedly created for her, her branch, and the business banking team.  (Def. SMF ¶ 73; Pl. SMF ¶ 15).  Thereafter, Human Resources investigated Plaintiff's complaint, including speaking with Rome about Smith's management style.  (Def. SMF ¶ 78).  Chase's Summary of Investigation

13

indicates that five employees, including Plaintiff, were interviewed as part of the investigation, with the following observations:

> The interviews indicated that Miles has an opportunity to improve his managerial style and motivational techniques.  Miles' managerial style is creating a hostile/intimidating work environment. Employees[] described his style as aggressive; abrasive; confrontational; his way or the highway; let[]s pressure roll down hill; condescending; belittling.  Miles makes comments such as: you're a fool; do you want this job; you're stupid; you're a liar; you're lazy. Employees do not think this approach is motivational (although one individual indicated he did not have a problem with this motivational style and described it as "edgy").  In addition, Miles demonstrates unprofessional behaviors such as discussing other employee's performance during one on one meetings; yelling at employees during meetings and conference calls.  Employees think their performance should be discussed with them directly and not with other[]s in the group.

(Doc. 47-8).  The Summary also indicates that Ms. Harris and Rome "were advised of the results of the interviews and corrective action was recommended (coaching for managerial style and inappropriate behaviors)."  (*Id.*).

Rome then talked to Smith and told him than an employee (whom he did not identify) had made a complaint related to Smith's managerial style and delivery, and that he would work with Smith to make sure that his messages were communicated properly.[5]  (Def. SMF ¶ 83; Smith Dep. at 60-64; Doc. 45-17 at ¶¶

---

[5] Both Rome and Smith testified that they did not know that it was Plaintiff who made the complaint.  (*See* Doc. 45-17 at ¶¶ 13-14; Smith Dep. at 60).  Plaintiff disputes that Rome did not know that Plaintiff made the complaint because the Summary of Investigation indicates that the complaint was discussed with Rome

13-15).   Thereafter, Smith reached out to several Area Managers for mentoring regarding communication delivery, including listening to their conference calls, reviewing their team e-mails, and shadowing them to see how they interacted with their teams.  (Def. SMF ¶ 85).

### H.   Plaintiff's June 2011 Action Plan

In early June 2011, Smith issued Plaintiff a performance action plan.  (Def. SMF ¶ 88; Pl. SMF ¶ 18).  The Plan set out targets for account funding, premier client contact, and sales credits.  (*See* Doc. 45-12 at 21).  Plaintiff's pay and benefits were not reduced and her position did not change as a result of the action plan.  (Def. SMF ¶ 90).  Plaintiff's action plan was not placed in her personnel file, but instead was only shared between her and Smith.  (Def. SMF ¶ 91).

### I.   Plaintiff's 2011 Application For Relationship Manager Position

On December 21, 2011, Plaintiff applied for a Relationship Manager position.  (Def. SMF ¶ 92).  Plaintiff had informed Smith via e-mail that she was interested in applying for the position, and he responded, "Go ahead and post," and told her that based on his conversation with "Brandon" (the manager over the Relationship Manager position), Smith "believe[d] they are looking to fill that by

---

and he commented that "[a]ll but one of the individuals interviewed are on corrective action."  (Pl. resp. to Def. SMF ¶ 79; *see also* Doc. 47-8).  While the Summary indicates that Rome knew which employees were interviewed, including Plaintiff, it does not show that he was told who made the complaint.

end of 1st qtr." (*See* Doc. 47-28).   A Chase Recruiting Manager reviewed and

preliminarily accepted Plaintiff's application.  (Def. SMF ¶ 93).   On February 13,

2012, Chase cancelled the requisition for the Relationship Manager position due to

a change in Chase's staffing needs, and no one was hired to fill the position.  (Doc.

47-18 at ¶ 9).  Chase notified Plaintiff of the cancellation on or about February 13,

2012.  (Def. SMF ¶ 95).  Rome and Smith did not possess any decision-making

authority regarding the Relationship Manager position, and had no involvement

with respect to Chase's cancellation of the requisition.  (Def. SMF ¶ 96).[6]

### J.      **Plaintiff's 2011 Performance Review**

In January 2012, Plaintiff received her 2011 annual performance review

from Smith in which Smith found that Plaintiff met expectations.  (Def. SMF ¶ 97;

Pl. SMF ¶ 20; Doc. 45-12 at 8-10).   During a meeting to discuss her performance

---

[6] Plaintiff denies that Rome and Smith lacked decision-making authority regarding
the Relationship Manager position because "[w]hen applying for an internal
position, the employee's manager is informed that an application for another
position has been submitted."  (Pl. resp. to Def. SMF ¶ 96).   The fact that
Plaintiff's managers knew that she had applied for a Relationship Manager position
does not indicate that they had any decision-making authority for that position or
any involvement in the cancellation of the requisition for that position.   Plaintiff
also contends that they were involved because "Plaintiff was informed that her
application was being rejected  . . . on February 13th, which was one month after
the issuance of her performance evaluation and the same day she was subject to [a]
staged audit," discussed below.   (*Id.*).   The sequence of those events does not
create an issue of fact on whether Rome or Smith had any role in the cancellation
of the Relationship Manager requisition.   Mere speculation, in the absence of any
supporting evidence, is insufficient.

review, Plaintiff informed Smith that she wanted to obtain a Vice President title and move into the Relationship Manager channel at that time.  (Def. SMF ¶ 98). Smith acknowledged Plaintiff's desire to obtain a Vice President title in the comments section of her review, and noted that he and Plaintiff would work together so he could help position Plaintiff for a Vice President nomination that year.  (Def. SMF ¶ 99).  Plaintiff disagreed with her review because she believed there was nothing she needed to do in terms of building her skills in order to become a Vice President, and she also disagreed with certain comments relating to funding.  (Def. SMF ¶ 100).

### K.    Chase's February 2012 Investigation Of Plaintiff's Accounts

On February 7, 2012, Branch Business Banking Area Trainee Manager Heidi Scobell and Smith conducted a review of accounts opened November 1, 2011 to January 31, 2012 by all Business Bankers on Smith's team.[7]  (Doc. 45-15 at ¶ 9).  Smith testified that he and Scobell "discovered that several of the business accounts were opened incorrectly and without proper account documentation in contravention of Chase's Business Guidelines for opening business accounts (i.e., some accounts were designated as sole proprietorships where they should have

_____

[7] Plaintiff asserts that Smith "only audited Plaintiff Johnson" (Pl. resp. to Def. SMF ¶ 101), but she did not cite to evidence that supports that assertion or explain the basis of her purported knowledge of what Smith did at the other branches under his supervision.  Even if Smith only audited Plaintiff, however, the undersigned's analysis and conclusions remain unchanged.  Thus, this "dispute" is not material.

been corporations)," and "several accounts had been opened without proper identification for the account holder, and/or without signatures on account signature cards." (*Id.* at ¶ 10). On or about February 8, 2012, Business Bankers were required to bring their signature cards and new accounts documentation for the November, December, and January time frame to the Monarch Tower branch for a market audit workshop. (Def. SMF ¶ 104). Rome, Kuniasky, Smith, Scobell, and a Chase employee who specializes in audits were present for the workshop. (Def. SMF ¶ 105). Each Business Banker reviewed another Business Banker's account documentation. (Def. SMF ¶ 107). Smith asked the group if anyone reviewed files that were in good order, and the two individuals reviewing Plaintiff's accounts raised their hands. (Def. SMF ¶ 108). Smith responded that their observations could not be possible because he had previously reviewed Plaintiff's accounts, which made Plaintiff feel belittled by Smith. (Def. SMF ¶ 109).

On February 13, 2012, Smith informed Plaintiff telephonically that he had reviewed twenty of her business accounts and found multiple errors in them, and that the accounts he previously reviewed had not been corrected. (Def. SMF ¶ 110). Plaintiff asserts that "Smith did not prove that any errors were actually made by Plaintiff." (Pl. resp. to Def. SMF ¶ 110). Smith told Plaintiff that she needed to bring all of her accounts to his office the following morning. (Def. SMF ¶ 111).

On February 14, 2012, Smith and Kuniasky met with Plaintiff to discuss her accounts. (Def. SMF ¶ 112). During the meeting, Smith asked Plaintiff about several specific customer accounts. (Def. SMF ¶ 113). Smith also asked Plaintiff why Henry Vargas, a Personal Banker at her branch, opened so many accounts for her. (Def. SMF ¶ 114).

### L.   **Plaintiff's Termination**

Smith testified that "[i]n light of the large number of accounts that were opened by Ms. Johnson, I believed that [she] was purposefully manipulating business account procedures to give the customer 'what they wanted' and to increase incentive compensation in violation of Chase's Code of Conduct and the Ethics & Professional Standards section of Chase's Business Banker Incentive Plan for 2011."[8] (Doc. 45-15 at ¶ 13). Smith then completed a Recommendation

---

[8] As part of the terms and conditions of employment at Chase, all employees are required annually to sign an affirmation that they have read and understood Chase's Code of Conduct, and that they agree, as a condition of employment, to comply with the Code. (Def. SMF ¶ 1). Section 5.4.2 of the Code prohibits, in relevant part:

> The falsification of any book, record, or account relating to the business of JPMorgan Chase, its customers, or its suppliers, or to the disposition of assets of the firm, its customers, or its suppliers (including without limitation the submission of any false expense statement, claim for reimbursement of a non-business expense, falsification of information relating to sales incentive plans, or a false employee record or claim under the employment benefit plan) . . . .

for Termination for Plaintiff on February 16, 2012, and sought approval from senior management and Human Resources for the termination.  (Def. SMF ¶ 116). In his recommendation, Smith described errors in five accounts and how those errors violated the Code of Conduct.  (*See* Doc. 45-16 at 20-22).  The termination decision was approved by Rome, Human Resources Business Partner Seth Miltimore (Caucasian), and Human Resources Business Partner Tiffany Harris (African-American).  (Def. SMF ¶ 117).  Smith notified Plaintiff that she was terminated on February 21, 2012.  (Def. SMF ¶ 118; Johnson Dep. at 129).

### M.   Plaintiff's Pre-Termination February 2012 Complaints

Although not mentioned in her judicial Complaint, Plaintiff now alleges that she "filed another HR complaint for discrimination after the audit on February 14th" (Doc. 47-2 at ¶ 13), and she submitted in response to Defendants' motion an unsigned memo or letter purporting to be her February 14, 2012 complaint (*see* Doc. 47-13).  The letter is not addressed to a particular person, and Plaintiff has not pointed to evidence showing who, if anyone, actually received the letter.  Ms. Harris, an HR Business Partner, testified that HR did not receive the complaint. (*See* Doc. 53-1 at ¶ 6).

---

(Def. SMF ¶ 2).  If employees violate the Code of Conduct, they may be subject to corrective action, including termination.  (Def. SMF ¶ 3).  Plaintiff received and reviewed the Code of Conduct on an annual basis, and was familiar with its contents.  (Def. SMF ¶ 4).

On February 20, 2012, the day before Plaintiff was terminated, Plaintiff informed Pam Mayer, a Chase Human Resources Business Partner, about Smith's request for her account files and her belief that Smith had mistreated her. (Def. SMF ¶ 121). Plaintiff told Mayer that Smith had mistreated her based on his audits and communications with her, and Mayer said that Plaintiff should let him know that she did not appreciate his behavior during their next meeting. (Def. SMF ¶ 122). Plaintiff testified that she does not recall the specifics of her conversation with Mayer about Smith's mistreatment, including whether she told Ms. Mayer that she felt discriminated against because of her race and color, but presumes she complained about the audits and the way he spoke to her, accusing her of doing something she did not do. (Johnson Dep. at 237-238). Ms. Mayer's notes of that call indicate that Plaintiff complained that Smith was "very combative in discussions"; that he had required her to bring 90 of her accounts to him on February 14th and "went over each account and focused on documentation errors"; and that he was "very accusatory and told her that due to the excessive [number] of account opening errors, he finds it suspect that she is opening the [number] of accounts she said she is." (*See* Doc. 47-14). Plaintiff does not know what Mayer did in response to her complaint. (Def. SMF ¶ 125). Neither Smith nor Rome

knew about Plaintiff's complaint to Ms. Mayer before Plaintiff's termination. (Def. SMF ¶ 126; Doc. 45-15 at ¶ 16; Doc. 45-17 at ¶ 18).[9]

### N.   Plaintiff's Post-Termination Complaints

On February 22, 2012, the day after she was terminated, Plaintiff sent a letter to Human Resources Business Partner Kai Craig in an effort to refute the basis for her termination.  (Def. SMF ¶ 127; *see also* Doc. 45-12 at 11 through 17). After reviewing the facts and supporting documentation, and interviewing Smith and Rome, Ms. Craig advised Plaintiff that her termination for misconduct would not be rescinded, and she referred Plaintiff to another section of the Human Resources Department if she had any further questions.  (Def. SMF ¶ 128). Thereafter, Plaintiff spoke with Jennifer Wheatley, an employee in Chase's Employee Relations Department, and relayed the information that she had previously provided to Craig.  (Def. SMF ¶ 129).  During their final conversation, Wheatley told Plaintiff that the termination decision would stand.  (Def. SMF ¶ 130).

---

[9] Plaintiff denied Def. SMF ¶ 126 because "Defendants Rome and Smith terminated Plaintiff Johnson one day after she reported by phone and seven days after she submitted her February 14, 2012 written complaint opposing discrimination by Rome and Smith and demanding an investigation." (Pl. resp. to Def. SMF ¶ 126).  As discussed below, the temporal proximity between these events does not indicate that Rome and Smith knew about Plaintiff's February 2012 complaints and is insufficient to controvert their testimony that they did not know about those complaints.

### III.   Plaintiff's Claims

Plaintiff asserted the following claims against all Defendants: race and color discrimination in violation of Title VII and 42 U.S.C. § 1981 based on discriminatory harassment/creation of discriminatory hostile work environment by Smith (Count I); discriminatory failure to promote in violation of Title VII and § 1981 (Count II); and retaliation in violation of Title VII and § 1981 (Count III). (Doc. 1).   Defendants sought summary judgment on each of those claims (*see generally* Doc. 45-1).   In response, Plaintiff wrote that she "has two pending claims before this Court:  (1) Discrimination based on race (Failure-to-Promote); and (2) retaliation."   (Doc. 47 at 11).   As discussed below, to the extent that Plaintiff asserted additional claims in her Complaint beyond the two addressed in her response brief, she has abandoned them.[10]

---

[10] Defendants also moved for summary judgment on Plaintiff's purported demotion and sex discrimination claims (*see* Doc. 45-1 at 4 and n.1), but Plaintiff makes clear that she has not alleged such claims (*see* Doc. 47 at 12 n.9).   Although Plaintiff testified about being demoted and discriminated against because of her sex (*see* Johnson Dep. at 46-47, 58, 78-79, 246-48), the undersigned agrees with Plaintiff that she did not actually assert such claims in her Complaint.  (*See* Doc. 1 at Counts I, II, III).   Furthermore, although the parties refer in their briefs to Plaintiff's *discriminatory* discharge claim (*see* Doc. 45-1 at 18-19; Doc. 47 at 28), the undersigned does not read the Complaint to include such a claim.  (*See* Doc. 1 at Counts I, II, III).   Moreover, Plaintiff states in her response brief that her two remaining claims are a discriminatory failure to promote claim and a retaliation claim.  (*See* Doc. 47 at 11).   The undersigned has considered Plaintiff's claim that she was terminated in retaliation for engaging in statutory protected activity as set

### A.  Discriminatory Harassment/Hostile Work Environment Claim (Count I)

Plaintiff alleges in Count I that Defendants discriminated against her based on her race and color in violation of Title VII and § 1981 through Smith's alleged harassment and creation of a discriminatory hostile work environment.[11]  (Doc. 1 at ¶¶ 53-61).  Specifically, Plaintiff alleges that Smith heavily scrutinized her work, imposed demands not required of employees outside her race, required her to move her own work desk and harassed her by phone about completing that task, called her a "fool," and told her "You must be dumb," and "You just don't get it."  (*Id.*).

Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

---

forth in her Count III retaliation claim, but finds that Plaintiff has not alleged a separate *discriminatory* discharge claim.

[11] Although Plaintiff asserts all of her claims against Defendants collectively, her Title VII claims are only properly asserted against Defendant Chase, her employer, as Plaintiff acknowledges.  (*See* Doc. 47 at 12).  Her § 1981 claims, however, may be brought against the individual Defendants.  *See Shotz v. City of Plantation*, 344 F.3d 1161, 1176 (11th Cir. 2003).  For ease of reference, the undersigned refers to Defendants collectively, with the understanding that only the § 1981 claims are properly brought against Defendants Smith and Rome.  Furthermore, because Plaintiff's § 1981 claims are governed by the same standards that govern her Title VII claims, the undersigned's analyses and conclusions for those claims are the same.  *See Jackson v. UPS*, No. 13-15168, 2014 U.S. App. LEXIS 22092, at *8 (11th Cir. Nov. 20, 2014) ("[T]he standards applicable to Title VII and § 1981 are the same.").

religion, sex, or national origin[.]"  42 U.S.C. § 2000e–2(a)(1).[12]  Although "racial

harassment" is not explicitly mentioned in Title VII, "it has long been settled that

the statutory phrase 'terms, conditions, or privileges of employment' includes

within its scope a discriminatorily hostile or abusive environment."  *Hulsey v.*

*Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).  To establish a hostile

work environment claim based on race or color, the plaintiff must show:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been
> subject to unwelcome harassment; (3) that the harassment must have
> been based on a protected characteristic of the employee …; (4) that
> the harassment was sufficiently severe or pervasive to alter the terms
> and conditions of employment and create a discriminatorily abusive
> working environment; and (5) that the employer is responsible for
> such environment under either a theory of vicarious or of direct
> liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citing

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)).

In seeking summary judgment, Defendants argued that Plaintiff's

harassment claim should be dismissed because Plaintiff cannot establish that

Smith's alleged harassment was based on a protected characteristic or that it was

severe or pervasive, and because she has failed to demonstrate a basis for holding

Chase liable.  (Doc. 45-1 at 14-18).  Plaintiff did not address Defendants'

---

[12] Section 1981 provides that "[a]ll persons within the jurisdiction of the United
States shall have the same right . . . to make and enforce contracts . . . as is enjoyed
by white citizens."  42 U.S.C. § 1981(a).

arguments in support of their contentions that they are entitled to summary judgment on her harassment claim.  Instead, she asserted that she "has two pending claims before this Court: (1) Discrimination based on race (Failure-to-Promote); and (2) retaliation."  (Doc. 47 at 11).  She also explained that she "seeks to rely on" her allegations concerning Smith's conduct "as background evidence in an effort to meet her burden of persuasion" concerning her other claims.  (*Id.* at n.13).  Thus, she has abandoned her Count I claim.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.)(en banc) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's discriminatory hostile work environment claim (Count I).  *See, e.g.*, *Boone v. City of McDonough*, 571 Fed. Appx. 746, 751 (11th Cir. 2014) (unpublished decision) (finding that plaintiff had abandoned her First Amendment claim by not arguing it in response to defendants' motion for summary judgment); *Hamilton v. Boys and Girls Club of Metro. Atl., Inc.*, No. 1:12-CV-3609-TWT-LTW, 2014 U.S. Dist. LEXIS 114017, at *19 (N.D. Ga. July 21, 2014) (finding that summary judgment should be granted on plaintiff's age discrimination claim because she did not respond to the defendant's arguments on that claim and therefore abandoned it), *adopted by* 2014 U.S. Dist. LEXIS 114019 (N.D. Ga. Aug. 15, 2014).

## B.   Failure To Promote Claim (Count II)

In her Complaint, Plaintiff alleged that "Defendants have failed to promote Plaintiff on two occasions throughout her employment for which she was the candidate that was substantially more qualified over the selectee." (Doc. 1 at ¶ 66). She then goes on to describe those promotion decisions in setting out her failure to promote claim: (1) Defendant Rome's decision to "promote" Ms. Kuniasky into the Business Wholesaler position instead of Plaintiff (*see id.* at ¶¶ 70-76); and (2) Defendants' failure to promote Plaintiff to the position of Relationship Manager in 2011, after she had been convinced by Rome to "forfeit" the offered position of Branch Manager/trainee (*see id.* at ¶¶ 78-85).

### 1.   Non-Selection For Business Wholesaler Position

In moving for summary judgment, Defendants argue that Plaintiff cannot maintain a claim based on the selection of Ms. Kuniasky for the Business Wholesaler position (1) because the Business Wholesaler position was not in fact a promotion and (2) because Plaintiff has not shown that Rome's articulated reasons for selecting Kuniasky for the position were pretextual. (*See* Doc. 45-1 at 7-10 and n.2). Plaintiff did not respond to those arguments, however, or address in her response brief her failure to promote claim premised on her non-selection for the Business Wholesaler position. (*See generally* Doc. 47). Thus, she has abandoned her claim that Defendants discriminated against her by failing to "promote" her to

27

the Business Wholesaler position, and summary judgment is due to be granted to Defendants on that claim.  *See, e.g.*, *Hamilton*, 2014 U.S. Dist. LEXIS 114017, at *19.

### 2.  Non-Selection For Relationship Manager Position in 2011

Defendants argue that Plaintiff's claim that Defendants discriminated against her by failing to promote her to Relationship Manager in 2011 fails because Defendants did not reject her for that position but instead cancelled the requisition for that position due to a change in Chase's staffing needs, and no one filled that position.  (Doc. 45-1 at 12). In her response brief, Plaintiff did not respond to that argument or address her claim that Defendants failed to promote her to Relationship Manager in 2011.  (*See generally* Doc. 47).   Thus, Plaintiff has abandoned her claim that Defendants discriminated against her by failing to promote her to Relationship Manager in 2011, and summary judgment is due to be granted to Defendants on that claim.  *See, e.g.*, *Hamilton*, 2014 U.S. Dist. LEXIS 114017, at *19.

### 3.  Non-Selection For Relationship Manager in 2009

Instead of responding to Defendants' arguments concerning the promotion decisions set forth in Plaintiff's Complaint, Plaintiff now contends that Defendants' failure to promote her to a Relationship Manager position in *2009* was discriminatory.  (*See* Doc. 47 at 15-28).  Plaintiff asserts that Rome and Smith told

Plaintiff she would not be eligible for promotion until she had been in the Business Banker position for 18 months, so she did not apply for the 2009 promotion, which was given to an allegedly less qualified employee, Brian King.  (*See id.* at 16-18). As Defendants correctly point out in their reply, Plaintiff did not allege a claim based on the 2009 promotion decision in her judicial Complaint.  (*See* Doc. 53 at 2-3).  Plaintiff only identified two promotion decisions in support of her failure to promote claim: (1) Defendants' decision to "promote" Ms. Kuniasky to Business Wholesaler instead of Plaintiff, and (2) their failure to promote Plaintiff to Relationship Manager in 2011. (*See* Doc. 1 at ¶¶ 66-87).  Plaintiff cannot amend her Complaint through her response to Defendants' motion for summary judgment, and therefore, to the extent that Plaintiff now asserts a failure to promote claim based on Defendants' alleged failure to promote her to Relationship Manager in December 2009, that claim is not properly before the Court.  *See Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004))); *see also Boone*, 571 Fed. Appx. at 750-51 (finding that plaintiff's harassment and hostile work environment claims and contention that a defendant was liable "because he knew of and condoned racial discrimination" were not properly before the district court

because plaintiff had not amended her complaint to add those claims or allegations); *Hood v. Everbank*, No. 1:12-CV-1241-CAP, 2014 U.S. Dist. LEXIS 9871, at *8-9 (N.D. Ga. Jan. 8, 2014) (disregarding the plaintiff's new allegations made in response to motion for summary judgment because "the plaintiff may not amend his complaint by making new allegations in a brief in response to the motion" (citing *Gilmour*, 382 F.3d at 1315)); *Riley v. Columbus Consol. Gov't*, No. 4:12-CV-38 (CDL), 2013 U.S. Dist. LEXIS 108553, at *7 (M.D. Ga. Aug. 1, 2013) (finding that plaintiff's failure to promote claim based on his December 2012 application for a traffic engineer position was not properly before the court because he "did not seek leave to amend his Complaint to add a claim based on that decision").[13]

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's Title VII and § 1981 discriminatory failure to promote claim (Count II).

### C.   <u>Retaliation Claim (Count III)</u>

In her Complaint, Plaintiff alleges that Defendants retaliated against her for opposing unlawful practices under Title VII and § 1981.  Specifically, she alleges

---

[13] In her surreply, Plaintiff wrote, "If the Court deems that Plaintiff's failure-to-promote claim is not properly before the Court, the information argued under Section IV of Plaintiff's responsive brief [concerning her failure to promote claim] is presented to the Court as yet another example of Defendant Smith's animosity toward African-Americans."  (Doc. 59 at 15).

that on May 24, 2011, she submitted a complaint to Chase's Human Resources Department in which she "alleged that she was experiencing a hostile work environment as well as discrimination." (Doc. 1 at ¶ 92). She further alleges that "[i]mmediately after [she] filed her complaint . . ., Smith began to highly scrutinize [her] performance with random audits and requests for work even though Plaintiff was a top performer in the state of Georgia." (*Id.* at ¶ 93). She also alleges that on February 20, 2012, she filed another complaint with Human Resources "that included her blatant opposition to the hostile work environment and discrimination naming the same individuals that were included in the written complaint submitted in May 2011." (*Id.* at ¶ 94). Defendant then terminated Plaintiff the next day, February 21, 2012. (*Id.* at ¶ 96).

In their motion for summary judgment, Defendants argued that Plaintiff cannot establish a *prima facie* case of retaliation because: (1) her May 24, 2011 and February 20, 2012 complaints do not constitute statutorily protected activity; (2) none of the actions preceding her termination were adverse employment actions; and (3) Plaintiff cannot establish that her complaints were the "but for" cause of her termination because the decision-makers, Smith and Rome, had no knowledge of her May 2011 and February 2012 complaints and because her "manipulation of client accounts after her May 2011 complaint to Human Resources is an intervening event." (Doc. 45-1 at 20-24). Defendants also

contend that they had legitimate, non-retaliatory reasons for their actions, and Plaintiff has not shown that those reasons are pretextual.  (*Id.* at 24-25).

In response, Plaintiff addressed only her retaliatory termination claim.  (*See* Doc. 47 at 28-40).  She did not respond to Defendants' arguments in support of their motion as to the alleged acts of retaliation that occurred prior to her termination.  (*See id.*)  Thus, to the extent that Plaintiff's retaliation claim is premised on Defendants' actions prior to her termination, i.e., scrutinizing her performance, conducting audits of her accounts, and reviewing her work (*see* Doc. 1 at ¶ 93), Plaintiff has abandoned that portion of her retaliation claim. Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's retaliation claim, to the extent that it rests on actions taken prior to Plaintiff's termination.  *See, e.g.*, *Hamilton*, 2014 U.S. Dist. LEXIS 114017, at *19.

The undersigned now considers whether Defendants are entitled to summary judgment on Plaintiff's retaliatory termination claim.

### 1.    Analytical Framework

"Title VII makes it unlawful for an employer to discriminate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter.' "   *Word v. AT&T*, 576 Fed. Appx. 908, 912 (11th Cir. 2014)

(unpublished decision) (quoting 42 U.S.C. § 2000e-3(a)).   "Section 1981 also encompasses retaliation claims, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 . . . (2008), and the elements required to establish retaliation claims under § 1981 are the same as those required for retaliation claims under Title VII."  *Id.*  To demonstrate a *prima facie* case of retaliation in the absence of direct evidence, a plaintiff must show that she (1) engaged in statutorily protected activity; (2) suffered an adverse employment action; and (3) there is a causal connection between the protected activity and adverse action.  *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994).  If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged employment decision, after which the plaintiff must then demonstrate that the articulated reason is pretext for retaliation.  *See Word*, 576 Fed. Appx. at 912.

### 2. *Prima Facie* Case

It is uncontroverted that Plaintiff was terminated, thus satisfying the adverse employment action element of her *prima facie* case.  The remaining issues are whether she has at least created genuine issues of material fact on whether she engaged in statutorily protected activity, and whether a causal connection exists between her protected activity and her termination.

### a. Statutorily Protected Activity

The participation clause of Title VII "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC[.]"  *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000); *see also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (instigation of statutory proceedings is prerequisite to protection under participation clause).  The opposition clause, on the other hand, protects activity which occurs prior to the filing of a formal charge with the EEOC, such as making an internal complaint to one's employer about discrimination based on a protected characteristic such as race, sex, etc.  *See Rollins v. Fla. Dep't. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ("[T]he protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like Rollins, who informally voice complaints to their superiors or who use their employers' internal grievance procedures."); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

Defendants contend that Plaintiff's May 24, 2011 and February 20, 2012 complaints to Human Resources do not constitute statutorily protected activity because she did not complain about discrimination based on a protected characteristic, such as race, in her complaints.  (*See* Doc. 45-1 at 20-21).  In response to Defendants' motion, Plaintiff contends that she engaged in statutorily protected activity "on two different occasions," first on February 14, 2012 when

she "filed another written grievance naming Defendants Rome and Smith," and second, when she called Ms. Mayer on February 20, 2012.  (*See* Doc. 47 at 31-32). Thus, she appears to have abandoned any claim that she was terminated in retaliation for her May 2011 complaints to HR Business Partner Ron Jones.  In an abundance of caution, however, the undersigned has considered whether her May 2011 complaints, as well as her February 2012 complaints, constitute statutorily protected activity and whether a causal connection exists between her termination and those complaints.

In Plaintiff's May 24, 2011 letter to Ron Jones in HR, Plaintiff wrote that she was "submitting this formal complaint against Miles Tamburri-Smith due to the hostile work environment he has created in my current position."  (Doc. 45-12 at 3).  She then "outline[d] specific hostile incidents that Mr. Smith has placed on [her]self, [her] branch, and the business banking team," illustrating Smith's "rude, unprofessional and unfair treatment[.]  (*Id.* at 3-7).  In conclusion, she asked "that the condescending, demeaning, discriminatory behavior from Mr. Smith ceases." (*Id.* at 7).  Plaintiff did not, however, indicate that she believed that Smith created a hostile work environment because of her race or color.  She also indicated that he was creating a hostile environment for others without alleging that the mistreatment was based on a protected characteristic: "Once again, Mr. Smith has caused a hostile environment for me and the branch"; "Mr. Smith seems to single

out certain employees and discriminate against them *for no apparent reason*"; "During our training Mr. Smith became very rude and unprofessional to teammates during the session"; "Mr. Smith had frequent rude outburst[s] with participants in the class, he told the team on many occasions we could 'hit the door' if we didn't comply with his orders."  (Doc. 45-12 at 4-5 (emphasis added)).  Nor did Plaintiff allege that Smith engaged in behavior that might have put her employer on notice that she was complaining of race discrimination, such as using racially derogatory language.

Similarly, in her February 20, 2012 verbal complaint to Human Resources Pam Mayer, Plaintiff complained of Smith being "combative" and "accusatory" with her about her accounts, and that she was "unduly being focused on" compared to other Business Bankers (*see* Doc. 48-11; *see also* Johnson Dep. at 140, 237-38).  But she has not pointed to evidence that she complained to Ms. Mayer that Plaintiff's mistreatment of her was because of her race or color.  (*See* Doc. 48-11).

The undersigned questions whether Plaintiff's May 24, 2011 letter to Mr. Jones or her February 20, 2012 phone call with Ms. Mayer constitute statutorily protected activity for purposes of her Title VII and § 1981 retaliation claims because, even though Plaintiff complained that Smith was mistreating her and other employees, she did not complain that Smith was discriminating against her because of her race or color. "Title VII does not prohibit employers from

36

retaliating against an employee based on her opposition to practices that are outside the scope of Title VII." *Fonseca v. Comm'r of Soc. Sec.*, No. 8:11-cv-1800-T-30EAJ, 2013 U.S. Dist. LEXIS 18084, at *14-15 (M.D. Fla. Feb. 11, 2013); *see also Brush v. Sears Holding Corp.*, 466 Fed. Appx. 781, 786-89 (11th Cir. 2012) (unpublished decision) (finding that plaintiff's complaints about her employer's handling of an employee's rape allegation and subsequent investigation did not constitute statutorily protected activity because her opposition was not to a "practice made unlawful by [Title VII]").  Instead, Plaintiff's complaint appears to "la[y] out a list of grievances, but did not indicate that [s]he was discriminated against based on h[er] membership in a protected group." *Gerard v. Bd. of Regents of the State of Ga.*, 324 Fed. Appx. 818, 826 (11th Cir. 2009) (unpublished decision) (finding that the plaintiff's letter was not statutorily protected activity even though it complained of discrimination and unfair treatment and referred to plaintiff's race, because it did not indicate that the discrimination was based on his race); *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.").  "An employee cannot complain to his employer about unfair treatment in a racially-neutral way and expect the employer to divine that his complaint is really of race discrimination." *Redding v. Norbord*

*Ga., Inc.*, No. 5:07-CV-451 (CAR), 2010 U.S. Dist. LEXIS 4662, at *29-30 (M.D. Ga. Jan. 21, 2010); *see also Wehunt v. R.W. Page Corp.*, 352 F. Supp. 2d 1342, 1358 (M.D. Ga. 2004) ("It is not enough to simply complain in a racially neutral way about an employer's practices, and then expect the employer to speculate as to whether such complaints may be motivated by an employee's subjective and undisclosed belief that the employer was engaged in race discrimination."). Nevertheless, the undersigned will assume for the sake of moving on to the causal connection issue that Plaintiff's May 24, 2011 letter and February 20, 2012 were statutorily protected activity.

The undersigned also notes that the record contains an exhibit that appears to be Mr. Jones' notes of his May 18, 2011 phone call with Plaintiff, in which he indicated that Plaintiff told him "that she was filing a case against her manager for sex discrimination and creating a hostile work environment." (Doc. 47-7). Furthermore, in response to Defendants' motion for summary judgment, Plaintiff cites to a February 14, 2012 complaint she allegedly made to HR in which she complained of discrimination due to race, color, sex, and retaliation. (*See* Doc. 47 at 31; *see also* Doc. 47-13). Her letter or memorandum does not indicate that it was addressed to Human Resources or any person in particular, nor has Plaintiff pointed to evidence as to who, if anyone, in Human Resources actually received it. She did not testify about this alleged complaint during her deposition, and in her

Affidavit submitted in response to Defendants' motion for summary judgment, she simply testified that she "filed another HR complaint for discrimination after the audit on February 14th." (*See* Johnson Aff., Doc. 47-2 at ¶ 13).

Plaintiff did not allege in her judicial Complaint that she engaged in statutory protected activity on May 18, 2011 during her phone call with Mr. Jones or on February 14, 2012 when she allegedly submitted a written discrimination complaint to HR (*see* Doc. 1 at ¶¶ 90-96), and therefore, it is questionable whether those allegations are properly before the Court. *See, e.g.*, *Powell v. Doane*, No. 2:12cv440-WHA (wo), 2013 U.S. Dist. LEXIS 120002, at *17 (M.D. Ala. Aug. 23, 2013) (finding that plaintiff's claim that she engaged in protected activity by speaking to the media was not properly before the court because she did not allege it in her complaint and only identified her Ethics Complaint as her protected activity for purposes of her First Amendment retaliation claim). Again, out of an abundance of caution, the undersigned has considered Plaintiff's complaints May 18, 2011 phone call with Mr. Jones and her alleged February 14, 2012 written complaint—along with her May 24, 2011 letter to Mr. Jones and February 20, 2012 phone call to Ms. Mayer—in evaluating whether Plaintiff has at least created an issue of fact on whether a causal connection exists between those complaints and her termination. As discussed below, the undersigned finds that she has not done so.

**b.**     **Causal Connection**

As noted above, to establish a *prima facie* case of retaliation under Title VII, a plaintiff must, among other things, demonstrate a causal connection between the protected activity and adverse action.  *Meeks*, 15 F.3d at 1021.  To demonstrate a causal connection, a plaintiff must show that the decision-maker knew of the protected activity, and "that the protected conduct and adverse action were not wholly unrelated."  *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)); *see also Daniels v. Hale*, 350 Fed. Appx. 380, 386 (11th Cir. 2009) (*same*).

**i.**     **May 2011 Complaints**

Plaintiff has not pointed to evidence that a causal connection exists between her May 2011 complaints to Ron Jones and her February 2012 termination.  First, while Plaintiff has shown that Mr. Jones knew about Plaintiff's complaints, she has not pointed to evidence that Mr. Jones had any involvement in her termination, or that Smith, who recommended her termination, or Rome, who approved it, knew that she had engaged in statutorily protected activity.  " 'It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression.' "  *Cain v. Geren*, 261 Fed. Appx. 215, 217-18 (11th Cir. 2008) (unpublished decision) (quoting *Bass v. Bd. of Cnty.*

*Comm'rs, Orange Cnty., Fla.*, 256 F. 3d 1095, 1119 (11th Cir. 2001)).   "That requirement rests upon common sense.   A decision maker cannot have been motivated to retaliate by something unknown to him."   *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

Rome testified that he was informed by HR that an employee had filed a complaint in May 2011 against Smith "based on his management style," that he told Smith that a complaint had been filed against him "related to his managerial style and delivery," and that Rome "would work with him to make sure that his messages were communicated properly."   (*See* Doc. 45-17 at ¶¶ 13-15).   Smith also testified that Rome told him that an unidentified employee had complained about Smith's managerial style and delivery, but he did not know which employee had complained.[14]   (Smith Dep. at 60, 64, 164).

Thus, there is evidence that Rome and Smith were aware that Plaintiff had complained about Smith's "management style and delivery," but Plaintiff has not pointed to evidence that Rome or Smith knew or believed that Plaintiff had

_____

[14] While Rome and Smith testified that they did not know that Plaintiff was the employee who made the complaint (*see* Smith Dep. at 60; Doc. 45-17 at ¶¶ 13-14), Plaintiff contends that Rome knew, as evidenced by the Summary of Investigation which shows that Rome knew who HR interviewed during the investigation of her complaint.   (*See* Pl. resp. to Def. SMF ¶ 79; *see also* Doc. 47-8).   This "dispute" is not material.   Even if the Court assumes that Rome, or even Smith, knew that Plaintiff had complained about Smith, Plaintiff has not shown that they knew she complained about unlawful discrimination or that the May 2011 complaint is causally connected to her termination, as discussed below.

complained that Smith had discriminated against her because of her race, color, or other characteristic protected under Title VII.  Thus, Plaintiff has not shown that Smith and Rome were aware that she had engaged in statutorily protected activity. Nor has Plaintiff pointed to evidence that HR Business Partners Tiffany Harris and Seth Miltimore, who also reviewed and approved Smith's recommendation that Plaintiff be terminated (*see* Doc. 47-18 at ¶ 14; Doc. 45-17 at ¶ 19, were aware that Plaintiff had complained in May 2011 about alleged discrimination based on a protected characteristic or retaliation for engaging in statutorily protected activity when they approved Smith's recommendation that she be terminated. [15] Accordingly, Plaintiff has not shown that any of the decision-makers involved in the February 2012 decision to terminate Plaintiff knew that Plaintiff engaged in statutorily protected activity in May 2011.

In addition, the 9-month gap between Plaintiff's May 2011 complaints and her February 2012 termination is insufficient, without more, to establish a temporal connection between those events.  While close temporal proximity between the

---

[15] The Summary of Investigation shows that employees who were interviewed during Chase's investigation of Plaintiff's May 2011 complaint indicated that Smith's "managerial style [was] creating a hostile/intimidating work environment," and he was described "as aggressive, abrasive, confrontational; his way or the highway," etc.  (*See* Doc. 48-8).  The Summary does not indicate that anyone reported that Smith discriminated against employees on the basis of a protected characteristic.  (*Id.*).  Harris and Rome were "advised of the results of the interviews and corrective action was recommended (coaching for managerial style and inappropriate behaviors)."  (*Id.*).

protected activity and the adverse action can show that the protected conduct and the adverse action were not "wholly unrelated," the Eleventh Circuit has held that "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (finding a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough"); *see also Summers v. Winter*, 303 Fed. Appx. 716, 720 (11th Cir. 2008) (unpublished decision) (finding no causal connection between filing of EEOC complaint and denial of early retirement because the temporal proximity—9 months—"was not very close"); *Olson v. Lowe's Home Ctrs. Inc.*, 130 Fed. Appx. 380, 393 (11th Cir. 2005) (unpublished decision) (finding 9-month gap between complaint and adverse action to be "insufficient to show close temporal proximity" for purposes of establishing causal connection).

Accordingly, the undersigned finds that Plaintiff failed to present evidence from which a reasonable jury could find a causal connection between her May 2011 complaints to Ron Jones and her February 2012 termination.

### ii.     February 2012 Complaints

Plaintiff has also failed to point to evidence that Smith, who recommended her termination, or any of the individuals who approved his recommendation—

Rome, Harris, and Miltimore—knew that Plaintiff had complained in February 2012 that she was being mistreated because of her race, color, sex, or other protected characteristic when they made the decision to terminate her.  Although close temporal proximity exists between her alleged February 14, 2012 complaint, her February 20, 2012 complaint, and her February 21, 2012 termination, it has been held that " 'temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.' " *Crosby v. Gregory*, No. CV 212-140, 2014 U.S. Dist. LEXIS 127546, at *39-40 (S.D. Ga. Sept. 10, 2014) (quoting *Brungart*, 231 F.3d at 799).  Plaintiff stated in her Affidavit that she "filed another HR complaint for discrimination after the audit on February 14th" (Doc. 47-2 at ¶ 13), but the letter she allegedly submitted does not indicate to whom she provided the complaint (*see* Doc. 47-13), nor did she testify to whom she gave the letter or how it was submitted.  Harris stated in a Declaration that that HR did not receive Plaintiff's February 14, 2012 complaint (Doc. 53-1 at ¶ 6), which indicates that she was not aware of it.  Similarly, both Smith and Rome testified that they were not informed that Plaintiff had submitted a discrimination or harassment complaint to HR on February 14, 2012.  (*See* Doc. 60-1 at ¶ 2; Doc. 60-2 at ¶ 2).  Plaintiff has not pointed to evidence that any of the decision-makers were aware of her alleged February 14, 2012 complaint, and

therefore, she has not created an issue of fact on whether a causal connection exists between that complaint and her termination.

With respect to Plaintiff's February 20, 2012 phone call to Pam Mayer in HR, as discussed above, Plaintiff has not shown that she complained to Ms. Mayer about discrimination based on a protected characteristic or retaliation for engaging in statutorily protected activity.  Instead, Plaintiff's testimony about that call, and Ms. Mayer's notes, show that she complained about Smith's mistreatment of her, without specifying that she was complaining about discrimination or retaliation. (*See* Johnson Dep. at 140, 237-38; Doc. 47-14).  Moreover, Plaintiff has not shown that Ms. Mayer had any involvement in her termination or that any of the decision-makers knew or believed that Plaintiff had complained of discrimination or retaliation in her February 20, 2011 phone call to Ms. Mayer.  Smith and Rome testified that they did not know that Plaintiff had complained to Ms. Mayer about Smith's treatment of her prior to Plaintiff's termination (*see* Doc. 45-15 at ¶ 16; Doc. 45-17 at ¶ 18), and the record does not show that Ms. Harris or Mr. Miltimore knew about Plaintiff's February 20, 2012 call with Ms. Mayer when they approved Smith's recommendation for termination.  Even if any of the decision-makers had knowledge of that call or had reviewed Ms. Mayer's notes of the call, there is no evidence that they had notice that Plaintiff was complaining of a practice made unlawful by Title VII or § 1981.

Plaintiff relies solely on the temporal proximity of her complaints and her termination to establish the requisite causal connection, arguing that "causation exists due to the close period of time between Plaintiff's complaints and her termination." (Doc. 47 at 33). In response to Defendants' assertion, supported by citation to Smith's and Rome's declaration testimony, that Smith and Rome did not have knowledge of Plaintiff's February 2012 complaints (*see* Def. SMF ¶ 126), Plaintiff wrote, "Denied. Defendants Rome and Smith terminated Plaintiff Johnson one day after she reported by phone and seven days after she submitted her February 14, 2012 written complaint opposing discrimination she sustained by Defendants Rome and Smith and demanding an investigation." (Pl. resp. to Def. SMF ¶ 126). That temporal proximity is insufficient, however, in the absence of evidence that the relevant decision-makers knew that Plaintiff had complained in February 2012 about being discriminated against because of her race, color, sex, etc. *Brungart*, 231 F.3d at 799; *Crosby*, 2014 U.S. Dist. LEXIS 127546, at *39-40. Plaintiff's speculation that they must have known given the timing of events is insufficient to defeat summary judgment. *See Gerard*, 324 Fed. Appx. at 826-27 (finding that the plaintiff's speculation that the decision-maker was aware of the plaintiff's complaints did not create a genuine issue of material fact).

Of particular note, Smith had already conducted the audits and concluded that Plaintiff's accounts had several errors in them in early February 2012, even

46

prior to Plaintiff's alleged February 14, 2012 complaint, as she recounts in that complaint.  (*See* Doc. 47-13).  In fact, Smith's accusations against Plaintiff about her accounts and demands for further documentation were the subject of her February 2012 complaints.  (*See* Docs. 47-13, 47-14).  Plaintiff has not pointed to evidence that Smith then learned about her alleged February 14th complaint when he recommended on February 16, 2012 that she be terminated, or that Rome or the other approving managers learned about Plaintiff's February 14th or February 20th complaints when they approved Smith's recommendation.  Accordingly, Plaintiff has not created a genuine issue of material fact on whether a causal connection exists between her February 2012 complaints and her termination, regardless of the temporal proximity between those events.

Because Plaintiff has not created an issue of fact on each element of her *prima facie* case of retaliatory termination, that claim fails.[16]  Therefore, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's retaliation claim (Count III).  *See, e.g.*, *Cain*, 261 Fed.

---

[16] Because the undersigned finds that Plaintiff has failed to at least create a triable issue of fact on each element of her *prima facie* case, it is unnecessary to reach the issues of whether Defendants have articulated a legitimate, non-retaliatory reason for terminating Plaintiff or whether Plaintiff has shown pretext. *See Brush v. Sears Holding Corp.*, 466 Fed. Appx. 781, 786 (11th Cir. 2012) (unpublished decision) ("We need only turn to the remaining stages of the burden-shifting inquiry under McDonnell Douglas," i.e., the articulation of a legitimate, non-retaliatory reason by the employer and the showing of pretext by the plaintiff, "if a prima facie case is established.").

Appx. at 218 (finding that "the district court did not err in concluding that Cain failed to satisfy the causal connection *prima facie* element" where, among other things, "there was no evidence that the decision maker was aware of the protected activity"); *Ware v. Supreme Beverage Co., Inc.*, 927 F. Supp. 2d 1244, 1257 (N.D. Ala. 2013) (dismissing the plaintiff's claim for retaliation because he "presented no evidence that . . . the individuals who made the decision to discharge him" were aware of the plaintiff's protected activity); *Cash v. Cnty. of Glynn*, No. CV 210-175, 2012 U.S. Dist. LEXIS 120750, at *14 (S.D. Ga. Aug. 24, 2012) (finding that the plaintiff had "not presented evidence supporting one of the essential elements of a *prima facie* case for retaliation under Title VII" and granting summary judgment on that claim where the plaintiff had "failed to present any admissible evidence showing that Dees was aware that Plaintiff engaged in statutorily protected conduct in the months leading to her termination"); *McGrotha v. Fed Ex Ground Pkg. Sys., Inc.*, No. 5:05-CV-391(CAR), 2007 U.S. Dist. LEXIS 34047, at *34-35 (M.D. Ga. May 9, 2007) (granting summary judgment to defendants on retaliation claim because, in spite of close temporal proximity between the plaintiff's protected activity and her termination, her "inability to demonstrate" that the decision-maker knew of her complaint when he decided to terminate her was "fatal to her prima facie case"); *Bartlett v. W.T. Harvey Lumber Co.*, 398 F. Supp. 2d 1311, 1319-1321 (M.D. Ga. 2005) (granting summary judgment on the

plaintiff's retaliation claim because the plaintiff failed to show that the decision-makers were aware of the plaintiff's complaint until after she was terminated).

## **CONCLUSION**

Plaintiff's objection to Ms. Harris's Declaration (Doc. 50) is **OVERRULED**, and her motion to strike the Declaration (Doc. 55) is **DENIED**.  It is further **RECOMMENDED** that Defendants' motion for summary judgment (Doc. 45) be **GRANTED** and that Plaintiff's Complaint be **DISMISSED**.

The Clerk is **DIRECTED** to terminate referral of this matter to the undersigned magistrate judge.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 15th day of December, 2014.

 /s/  *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge